**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X

LINDSEY GRAY,

Plaintiff,

-against-

UNIQUE BRANDS COM, INC., RAW BRANDS INC., DEEPAK RAMANI a/k/a DEEPAK RAMCHANDANI, KAMAL RAMANI a/k/a KAMAL RAMCHANDANI, DEVYANI RAMANI a/k/a DEVYANI POPHALY, and UNIDENTIFIED CORPORATE ENTITIES 1-10,

Defendants.

-----------------------------------------------------------X

Case No.

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Lindsey Gray ("Gray" or "Plaintiff") alleges against Defendants Unique Brands Com, Inc. ("Unique"), Raw Brands Inc. ("Raw") (collectively, the "Company"), Deepak Ramani a/k/a Deepak Ramchandani ("Deepak"), Kamal Ramani a/k/a Kamal Ramchandani ("Kamal"), Devyani Ramani a/k/a Devyani Pophaly ("Devyani") (collectively, the "Ramanis"), and Unidentified Corporate Entities 1-10 (the "Unidentified Entities") (the Company, the Ramanis, and the Unidentified Entities, collectively, "Defendants") upon information and belief, as follows:

## NATURE OF THE CLAIMS

1. Gray complains pursuant to New York Labor Law § 740, *et seq.*, ("NYLL"), seeking damages to redress the lost wages, emotional distress, and other harms she suffered and continues to suffer as a result of being retaliated against after 'blowing the whistle' on several unlawful practices engaged in by Defendants—her former employers

2. Gray further complaints pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, ("NYSHRL"), and the New York City Human Rights Law, N.Y. Admin. Code § 8-101, *et seq.*, ("NYCHRL"), seeking damages to redress the lost wages, emotional

distress, and other harms she suffered and continues to suffer as a result of being discriminated against and subjected to a discriminatory hostile work environment by her former employers on the basis of her **sex/gender**.

3. The New York State and New York City anti-discrimination and anti-retaliation laws are intended to afford all employees the same rights, regardless of whether they have objected to their employer's unlawful conduct and regardless of their sex/gender and provide them with the dignity and respect they deserve in the workplace. As such, this is an action for declaratory and monetary relief to redress Defendants' unlawful employment practices, including the unlawful retaliation and discrimination committed against Plaintiff.

4. In addition, Gray brings claims against Defendants for their willful violations of NYLL §§ 190, *et seq*., with respect to Plaintiff's employment.

5. Specifically, Defendants failed to pay Gray any compensation for the work she performed for the first two weeks of her employment with Defendants, violating the promised pay and prompt pay provisions of the NYLL.

## JURISDICTION AND VENUE

6. This Court has original subject matter jurisdiction over Plaintiff's claims arising under New York State and New York City law pursuant to the provisions of 28 U.S.C. §§ 1332(a)(2)(1), in that the amount in controversy, exclusive of interest and costs, exceeds $75,000, and complete diversity of citizenship exists between Plaintiff and Defendants.

7. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

8. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

**Plaintiff Lindsey Gray**

9. At all times relevant to this action, including at the time of the filing of this action, Gray permanently resides and is domiciled in the State of New Jersey.

10. As such, at all times relevant to this action, Gray was and is a citizen of the State of New Jersey.

11. At all times relevant to this action, Gray was and is a woman.

12. From January 21, 2026, through May 19, 2026, Gray was employed by Defendants as the Vice President of Human Resources.

13. For the duration of her employment with Defendants, Gray worked under the direct management and supervision of, and was in a subordinate position to, the Ramanis.

14. For the duration of Gray's employment with Defendants, the Ramanis possessed the authority to hire and fire Gray, establish her rate and method of pay, determine her work schedule, maintain her employment records, assign her duties and responsibilities, evaluate her performance, discipline her, establish, implement, and enforce the Company's labor relations and personnel policies governing Gray's employment, and otherwise control terms and conditions of Gray's employment.

15. For the duration of her employment with Defendants—other than the period between Kamal countersigning Gray's offer letter and Gray's "official" start date—Gray reported to work at the Company's headquarters located at 205 W. 39th St., Floor 15, New York, New York 10018 (the "Office").

16. For the duration of her employment with Defendants, Gray was an employee of Defendants within the meaning of all applicable statues.

**The Company and Unidentified Entities**

17. The Company and Unidentified Entities are a New York-based apparel and fashion enterprise that manages wholesale distribution, online marketplaces, and direct-to-consumer eCommerce (the "Enterprise").

18. The Enterprise designs, sources, and imports clothing lines, including for fashion labels such as Forever 21.

19. The Enterprise and its constituent entities are owned and operated by the Ramanis as a family business.

20. Upon information and belief, Deepak and Kamal are brothers, and Deepak and Devyani are husband and wife.

21. The Ramanis created a multitude of real and fictitious corporate entities to operate the Enterprise.

22. The Ramanis are principals, shareholders, officers, and/or owners of the Company and the Unidentified Entities comprising the Enterprise.

23. Upon information and belief, in the course of doing business, including operating the Enterprise, the Ramanis identify themselves or allow themselves to be identified under a variety of derivations or derivative spellings of their names for illegitimate purposes, including to confuse and frustrate those wronged by the Enterprise—such as Plaintiff, other current and former employees, and other prospective litigants.

24. For example, Defendant Raw is a domestic business corporation organized and existing pursuant to the laws of the State of New York.

25. Pursuant to Raw's most recent biennial statement filed with the New York State Department of State on July 11, 2025, Raw identifies "Deepakk Ramaani" as its Chief Executive Officer ("CEO").

26. In his business emails, Deepak has used or adopted, as a variation on his first name, "Deepakk".

27. In Plaintiff's offer letter, Deepak is identified as "Deepak Ramani".

28. In different venues related to the operations of the Enterprise—including in other litigation—the Ramanis use or adopt, as variations on their last name, "Ramani", "Ramaani", or "Ramchandani".

29. Upon information and belief, the Ramanis use of different and inconsistent variations on their first and last names in the course of operating the Enterprise is intentional and intended to cause confusion.

30. Upon further information and belief, the Ramanis operate the Enterprise using a complex and intertwined combination of real and fictitious corporate entities for illegitimate purposes, including to confuse and frustrate those alleging wrongdoing by the Enterprise—such as Plaintiff, other current and former employees, and other prospective litigants.

31. Under one or more of the Enterprise's various identities, the Ramanis have operated the Enterprise since at least 2017 as a New York-based apparel and fashion distribution business.

32. During the operation of the Enterprise, the Enterprise has employed more than fifty employees, initiated litigation to protect the Enterprise's intellectual property and other interests, defended constituent entities in litigation other business disputes arising from the Enterprise's operation, and retained specialized, experienced counsel to represent the Enterprise in litigation.

33. Kamal is a Certified Public Accountant ("CPA").

34. As identified in his FINRA disclosures, Kamal has served as an Investment Advisor Representative, CPA, or Chief Financial Officer ("CFO") various corporate entities. Kamal's FINRA disclosures identify him as the CFO of Raw.[1]

35. Despite this level of sophistication and the resources available to them, the Ramanis operated the Enterprise using entity names including Unique Brands Com, Inc., Raw Brands Inc., Brands Unlimited, LLC, Brands Online, LLC, BrandX.com Inc d/b/a Bonton.com, Forever21, Rebecca Taylor, and Ramani Group, with no identifiable separation between the entities or delineation of the business purposes for each entity.

36. Upon information and belief, as of Plaintiff's termination, Defendants utilized at least 25 different entities to operate the Enterprise.

37. Additionally, despite Defendants' sophistication and resources, upon information and belief, Defendants' compliance with basic procedures of corporate formation and filings is deliberately haphazard.

38. For example, Defendant Unique is one of the primary entities under which Defendants held out the Enterprise to operate during Plaintiff's employment.

39. The offer letter accepted by Plaintiff is on letterhead of "Unique Brands Com, Inc." with an address of 121 W. 36th St., Suite 411, New York, NY 10008, is issued on behalf of "Unique Brands Com, Inc.", and is signed by "Kamal Ramani" on the first signature page as the CFO of "Unique Brands Com, Inc.".[2]

---

[1] As of June 19, 2026, Raw appears to be the only fashion/apparel-related entity identified in Kamal's FINRA disclosures.

[2] One of Kamal's signatures on Plaintiff's offer letter was made in his capacity as CFO for Unique Brands Com, Inc., and another of Kamal's signatures on the offer letter is in his capacity as CFO for Raw Brands Inc.

40. Further, on March 5, 2026, the Enterprise issued a recall of "children's pajama pants [for] violat[ing] the mandatory standards for flammability of children's sleepwear, posing a burn hazard and risk of serious injury or death to children."[3] The posting for this recall on the New York State Division of Homeland Security and Emergency Services website is entitled *Unique Brands Com Recalls Forever 21 Pajama Pants Due to Risk of Serious Injury or Death from Burn Hazard; Violates Mandatory Flammability Standards for Children's Sleepwear* and identifies the retailer as "Unique Brands Com, Inc., of New York, New York".[4]

41. Upon information and belief, Unique was incorporated in the State of Delaware on April 5, 2021.[5]

42. However, Unique Brands Com, Inc., is not an entity registered with the New York State Department of State.

43. Upon information and belief, the Ramanis' purpose in utilizing myriad corporate entities and variations of their names to operate the Enterprise is to conceal the identity of the true responsible and/or liable individuals and entities from those asserting wrongdoing by the Enterprise, so that the Enterprise is able to continue to operate unencumbered and to evade entry and/or collection of judgment against the true responsible and/or liable individuals and entities.

44. At all times relevant to this action, the constituent entities of the Enterprise—including Unique and Raw—maintained their principal place of business at the Office.

---

[3] https://www.dhses.ny.gov/unique-brands-com-recalls-forever-21-pajama-pants-due-risk-serious-injury-or-death-burn-hazard, retrieved August 23, 2026.

[4] Id.

[5] https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx, retrieved August 23, 2026, by speculative search of 'Unique Brands Com' on the Delaware Department of State online business entity search portal.

45. As such, Unique is a citizen of the States of Delaware and New York, and Raw is a citizen of the State of New York.

46. Upon information and belief, none of the constituent entities operating the Enterprise are incorporated in, have their principal places of businesses in, or have any members or partners who are citizens of the State of New Jersey.

47. For the duration of Plaintiff's employment with Defendants, the Company and the Unidentified Entities operated as a single integrated enterprise with respect to Plaintiff's employment.

48. At all times relevant to this action, the Company and the Unidentified Entities were employers Plaintiff within the meaning of all applicable statutes.

**Defendant Deepak Ramani a/k/a Deepak Ramchandani**

49. Upon information and belief, at all times relevant to this action, including at the time of the filing of this action, Deepak permanently resides and is domiciled in the State of New York.

50. As such, upon information and belief, at all times relevant to this action, Deepak was and is a citizen of the State of New York.

51. Deepak is a man.

52. At all times relevant to this action, including for the duration of Plaintiff's employment with Defendants, Deepak served as a principal, shareholder, officer, owner, and/or manager of the Company and the constituent entities of the Enterprise.

53. At all times relevant to this action, Deepak was the CEO of Unique and Raw.

54. At all times relevant to this action, including for the duration of Plaintiff's employment with Defendants, Deepak possesses or possessed an ownership interest in the

Company and possessed and exercised operational control over and policy making authority within the Company.

55. For the duration of Plaintiff's employment with the Company, Deepak was in a superior position to and possessed and exercised managerial and supervisory authority over Plaintiff.

56. In his capacity as the Company's CEO, at all times relevant to this action, including for the duration of Plaintiff's employment with the Company, Deepak possessed and exercised the power and authority to hire and fire Plaintiff, establish her rate and method of pay, determine her work schedule, maintain her employment records, assign her duties and responsibilities, evaluate her performance, discipline her, establish, implement, and enforce the Company's labor relations and personnel policies governing Plaintiff's employment, and otherwise control terms and conditions of Plaintiff's employment and those of other individuals employed by the Company.

57. At all times relevant to this action, employees of the Company, including Plaintiff, could complain to Deepak directly regarding any of the terms of their employment, and Deepak would have the authority to effect any changes to the quality and terms of their employment.

58. For the duration of Plaintiff's employment with the Company, Deepak directly managed and supervised Plaintiff from the Office.

59. The acts of the Company charged in this Complaint were authorized, directed or accomplished by Deepak individually, by himself or his agents, officers, employees or representatives, while actively engaged in the management of the Company.

60. At all times relevant to this action, Deepak was an employer of Plaintiff within the meaning of all applicable statutes.

61. Deepak is personally and jointly and severally liable for the violations of the law alleged against the Company herein.

**Defendant Kamal Ramani a/k/a Kamal Ramchandani**

62. Upon information and belief, at all times relevant to this action, including at the time of the filing of this action, Kamal permanently resides and is domiciled in the State of California.

63. As such, upon information and belief, at all times relevant to this action, Kamal was and is a citizen of the State of California.

64. Kamal is a man.

65. At all times relevant to this action, including for the duration of Plaintiff's employment with Defendants, Kamal served as a principal, shareholder, officer, owner, and/or manager of the Company and the constituent entities of the Enterprise.

66. At all times relevant to this action, Kamal was the CFO of Unique and Raw.

67. At all times relevant to this action, including for the duration of Plaintiff's employment with Defendants, Kamal possesses or possessed an ownership interest in the Company and possessed and exercised operational control over and policy making authority within the Company.

68. For the duration of Plaintiff's employment with the Company, Kamal was in a superior position to and possessed and exercised managerial and supervisory authority over Plaintiff.

69. In his capacity as the Company's CFO, at all times relevant to this action, including for the duration of Plaintiff's employment with the Company, Kamal possessed and exercised the power and authority to hire and fire Plaintiff, establish her rate and method of pay, determine her

work schedule, maintain her employment records, assign her duties and responsibilities, evaluate her performance, discipline her, establish, implement, and enforce the Company's labor relations and personnel policies governing Plaintiff's employment, and otherwise control terms and conditions of Plaintiff's employment and those of other individuals employed by the Company.

70. At all times relevant to this action, employees of the Company, including Plaintiff, could complain to Kamal directly regarding any of the terms of their employment, and Kamal would have the authority to effect any changes to the quality and terms of their employment.

71. For the duration of Plaintiff's employment with the Company, Kamal primarily directly managed and supervised Plaintiff remotely, from California.

72. The acts of the Company charged in this Complaint were authorized, directed or accomplished by Kamal individually, by himself or his agents, officers, employees or representatives, while actively engaged in the management of the Company.

73. At all times relevant to this action, Kamal was an employer of Plaintiff within the meaning of all applicable statutes.

74. Kamal is personally and jointly and severally liable for the violations of the law alleged against the Company herein.

**Defendant Devyani Ramani a/k/a Devyani Pophaly**

75. Upon information and belief, at all times relevant to this action, including at the time of the filing of this action, Devyani permanently resides and is domiciled in the State of New York.

76. Upon information and belief, at all times relevant to this action, Devyani resides with Deepak, her husband.

77. As such, upon information and belief, at all times relevant to this action, Devyani was and is a citizen of the State of New York.

78. At all times relevant to this action, including for the duration of Plaintiff's employment with Defendants, Devyani served as a principal, shareholder, officer, owner, and/or manager of the Company and the constituent entities of the Enterprise.

79. At all times relevant to this action, Devyani was the Chief Operating Officer ("COO") of Unique and Raw.

80. At all times relevant to this action, including for the duration of Plaintiff's employment with Defendants, Devyani possesses or possessed an ownership interest in the Company and possessed and exercised operational control over and policy making authority within the Company.

81. For the duration of Plaintiff's employment with the Company, Devyani was in a superior position to and possessed and exercised managerial and supervisory authority over Plaintiff.

82. In her capacity as the Company's COO, at all times relevant to this action, including for the duration of Plaintiff's employment with the Company, Devyani possessed and exercised the power and authority to hire and fire Plaintiff, establish her rate and method of pay, determine her work schedule, maintain her employment records, assign her duties and responsibilities, evaluate her performance, discipline her, establish, implement, and enforce the Company's labor relations and personnel policies governing Plaintiff's employment, and otherwise control terms and conditions of Plaintiff's employment and those of other individuals employed by the Company.

83. At all times relevant to this action, employees of the Company, including Plaintiff, could complain to Devyani directly regarding any of the terms of their employment, and Devyani would have the authority to effect any changes to the quality and terms of their employment.

84. For the duration of Plaintiff's employment with the Company, Devyani managed and supervised Plaintiff from the Office.

85. The acts of the Company charged in this Complaint were authorized, directed or accomplished by Devyani individually, by herself or her agents, officers, employees or representatives, while actively engaged in the management of the Company.

86. At all times relevant to this action, Devyani was an employer of Plaintiff within the meaning of all applicable statutes.

87. Devyani is personally and jointly and severally liable for the violations of the law alleged against the Company herein.

## FACTUAL ALLEGATIONS

88. By letter dated January 20, 2026, the Company offered Gray the position of Vice President of Human Resources, with a start date of January 30, 2026.

89. On January 20, 2026, Gray signed the offer letter, and on January 21, 2026, Kamal countersigned the offer letter on behalf of the Company.

90. The offer letter dictated Gray's start date as January 30, 2026.

91. In the offer letter, Plaintiff was promised a starting base salary of $180,000 per year.

92. The offer letter stated that the Company would pay Gray bi-monthly, on the 10th and 25th of each month.

93. As the Vice President of Human Resources, Gray's ostensible duties and responsibilities included building the Company's Human Resources department, overseeing employee relations such as recruitment and terminations, implementing the Company's employee benefits programs, ensuring compliance with applicable federal, state, and local laws and regulations, creating policies and procedures, and creating job descriptions, in furtherance of the operations of the Enterprise.

94. Prior to commencing employment with Defendants, Gray had over two decades of experience in the field of human resources within the fashion industry.

95. Gray was, at all times relevant to this action, qualified for the Vice President of Human Resources position within the Company.

96. Though the offer letter dictated Gray's start date as January 30, 2026, as of the date Kamal countersigned the offer letter—January 21, 2026—Deepak required Gray to start working for the Company.

97. Beginning January 21, 2026, Deepak and Kamal called Gray with requests to start setting up systems, creating policies, and directed her to answer questions from employees (whom she had not yet met).

98. Wanting to make a good impression and avoid conflict, as directed, Gray performed work for the Company in advance of her start date.

99. Defendants provided Gray with a company email address and access to her company email account in January 2026.

100. Despite Gray's experience and qualifications, the Ramanis did not allow Gray to carry out many of her ostensible duties and responsibilities independently.

101. Specifically, for certain of her ostensible duties—particularly, compensation-related duties such as implementation of employee benefits—the Ramanis refused to provide Gray with access to the Company's accounts, plan documents, or other necessary information.

102. Additionally, Gray could not hire, terminate, modify compensation, implement new policies, or modify existing policies to ensure compliance without the Ramanis' approval.

103. Without the ability or independent authority to carry out a significant portion of her ostensible duties and responsibilities, Gray was reliant on the Ramanis—particularly Deepak and Kamal—for access to information and approval to take actions necessary to perform her job.

104. Further, given Kamal's internal knowledge of the Company's financials due to his position as CFO and expertise with respect to employee compensation, benefits, and other financial aspects of Gray's duties and responsibilities—particularly Kamal's tax expertise, as a CPA—Gray could not effectively perform her duties and responsibilities without Kamal sharing his institutional knowledge and collaborating with Gray.

105. At all times relevant to this action, to the extent Gray was able and allowed to perform her duties and responsibilities, she did so satisfactorily.

106. Although she was performing work for the benefit of the Company and at the direction of its executives, Gray was not paid for the work she performed from January 21, 2026, through February 1, 2026, because the Company moved Gray's "official" start date to February 2, 2026.

107. Deepak referred to the work Gray performed during this period as "helping out".

108. Because Defendants required Gray to start working in advance of her "official" start date, Gray asked Deepak if she could enroll in the Company's medical, dental and vision

plans on April 1, 2026—the first day of the month following 60 days after the commencement of her employment, as provided for in her offer letter.

109. Deepak rejected Gray's request.

110. When Gray remined Deepak that she started working in January, Deepak reiterated his rejection and told Gray, "Don't ask again."

111. Because Deepak refused to credit Gray's actual start date and moved her "official" start date to February 2, 2026, Gray was unable to enroll in the Company's benefits plan until May 1, 2026—an additional month beyond when she should have been eligible to enroll.

112. Immediately upon starting employment with the Company, several employees approached Gray with serious concerns regarding their 401k plans.

113. Gray was informed that the Company was deducting employees' 401k contributions from their salaries but not depositing the funds—or the promised match—in their 401k accounts.

114. Gray was concerned by the employees' complaints.

115. Both in person and via email, Gray raised her concerns to Kamal and Deepak about the Company taking deductions from employees' pay for 401k contributions but not depositing the deducted funds or the promised match in the employees' 401k accounts.

116. Deepak told Gray to speak with Kamal.

117. Kamal responded by explaining to Gray that the Company did not renew the 2025 401k plan and was "in the process" of setting up the 2026 plan.

118. Gray asked Kamal what the Company was doing with the funds deducted from employees' paychecks as "contributions".

119. Kamal told Gray that the Company was keeping the funds deducted from employees' paychecks as "contributions" in a separate business account maintained by the Company.

120. Gray was extremely alarmed by Kamal's response.

121. She replied to Kamal that the Company absolutely cannot "hold" employees' 401k contributions and that the Company must return the "contributions" to each employee immediately and in full, as wages.

122. In addition to objecting to the theft of employees' "contributions", Gray pointed out to Kamal that the "contributions" needed to be taxed as wages, with appropriate withholdings and payroll taxes paid, as the Company was not entitled to treat the funds as "pre-tax" contributions.

123. Gray explained that she needed to inform the Company's employees about the lack of an active 401k plan at the Company and the return of the employees' wages.

124. However, Kamal forbade Gray from notifying employees that the 2025 401k contribution plan had expired, and the Company had no active plan.

125. Kamal further told Gray that the Company will notify employees about the "new" 401k contribution plan once it was set up.

126. When Gray persisted and asked what she should do when an individual employee asked her about their 401k "contribution", Kamal instructed Gray that she could tell the individual employee that the 2025 401k plan was no longer in effect.

127. However, Kamal prohibited Gray from issuing a company-wide statement or otherwise affirmatively informing employees that they were not actively enrolled in a 401k program and would not be entitled to the promised match.

128. Among other provisions of federal, state, and municipal statutes or common law, the scheme described above constitutes wage theft (specifically, unlawful deductions in violation of the FLSA and NYLL and failure to pay promised wages, in violation of the NYLL), violations of federal and state tax law (for failing to provide proper tax treatment of the withheld wages), common law fraud (for concealing the scheme), conversion (for retaining the wages due to employees), and failing to offer a mandatory retirement savings plan (in violation of the New York Secure Choice Savings Program).

129. Kamal knew that the Company could not lawfully retain employees' 401k contributions.

130. Further, as a CPA, Kamal knew that the Company's treatment of the employees' 401k contributions was not compliant with federal and state tax laws.

131. In addition to the unlawful 401k contribution scheme, Gray became aware that the Company was misclassifying non-exempt employees as exempt and failing to pay them overtime pay.

132. Gray began raising concerns about the Company's apparent failure to comply with wage-and-hour laws to the Company's executives.

133. For example, on April 3, 2026, Gray emailed Kamal, copying Deepak and Devyani, regarding the resignation of Sales Assistant, Shraddha Rane ("Rane").

134. In her email, Gray expressed concern that the Company did not pay Rane overtime wages for the overtime hours she worked, classifying Rane as "salary/non-exempt" but paying her a salary of only $58,000—below the minimum salary threshold necessary to classify an employee as exempt under the NYLL ($66,300 annually, as of January 1, 2026).

135. Noting that the Company tracked Rane's hours, Gray asked if the Company was going to pay Rane the overtime wages it owed her.

136. In or around early-April 2026, Gray expressed similar concerns with respect to Assistant Designer Anna Sheller ("Sheller").

137. On April 7, 2026, in advance of Sheller's resignation (effective April 10, 2026), Gray emailed Kamal, copying Deepak, to express concerns that Sheller was also paid below the minimum salary threshold to qualify for an exemption.

138. Gray complained that the Company was misclassifying Sheller as exempt and not paying her overtime wages for the overtime hours she worked, yet the Company paid Sheller only $50,000 per year—below the NYLL exemption threshold.

139. Gray also referenced the Company's failure to address the issue when she previously raised it with respect to Rane.

140. Gray continued to raise concerns regarding the misclassification of non-exempt employees, both with respect to Rane and Sheller and generally.

141. By way of example, Gray expressed concerns to Kamal that certain positions the Company classified as exempt did not meet the "duties test"—a prerequisite for classifying executive, administrative, and professional employees as exempt, regardless of salary.

142. Additionally, during Sheller's exit interview, Sheller told Gray that she was leaving the Company due to compensation, disclosing to Gray that she would be receiving a salary of $67,000 at her new job.

143. Gray's complaints about the Company's non-compliance with wage-and-hour law failed to motivate the Company's executives to change their unlawful pay practices.

144. Because the Company was not willing to remediate their unlawful pay practices despite the compliance issue identified by Gray, Gray was forced present a different justification to the Ramanis to attempt to convince them to properly compensate its employees.

145. In a conversation with Deepak, Gray attempted to frame the issue as a personnel problem for the Company.

146. Gray explained to Deepak that Sheller left the Company because she would be making $67,000 at her new job, warning that the Company would continue to lose employees if it did not increase salaries to at least the minimum threshold to qualify for an exemption.

147. Deepak responded, "If she [referring to Sheller] wanted a promotion, she should have asked for it."

148. Gray, expressing frustration and concern at the Company's continued willful disregard of wage-and-hour law compliance, responded, **"It's not a promotion, it's the law. She was never paid correctly, I don't know how your brother [Kamal] allowed this. We need to adjust this and provide back pay."**

149. Gray asked both Deepak and Kamal if she could provide Sheller, Rane, and any other misclassified employee with the overtime compensation they were owed; however, they ignored Gray and continued to brush off her concerns, growing increasingly more upset with Gray that she continued to press the issue.

150. Following and because of Gray's persistent objections to the Company's unlawful 401k plan scheme and misclassification (and underpayment) of non-exempt employees, Kamal became enraged, and Deepak and Devyani stopped speaking to Gray entirely.

151. In or around mid-April, Gray went into Deepak's office to discuss a message he sent her.

152. After a brief conversation, Deepak told Gray to “get the fuck out” of his office.

153. After this conversation, Deepak refused to schedule meetings with Gray and did not speak to Gray for the remainder of her employment with the Company.

154. When Gray approached Deepak’s office door, Deepak disrespectfully held his hand up to stop her and, without speaking, waved her away.

155. Kamal was exceptionally hostile to Gray following her objections to the Company’s unlawful conduct.

156. Kamal was extremely nasty and dismissive of Gray, refused to respond to necessary work-related communications, redirected conversations to criticize her for unrelated issues, reprimanded her for not performing tasks that Kamal specifically indicated she was not authorized to perform, accused her of failing to complete tasks he never assigned and follow instructions he never sent her (for example, when Gray respectfully asked Kamal to forward her the emails with the instructions he was referencing, Kamal did not respond—because they never existed), and refused to provide guidance necessary and requested by Gray—especially with respect to tax-related issues (which is Kamal’s expertise, as a CPA)—so that she could draft policies and perform other of her ostensible job duties.

157. Because the Company refused to grant her access to necessary accounts, documents, and materials, and would not provide her independent authority to make meaningful personnel-related decisions, the Company forced Gray to rely on the Ramanis to be able to carry out the duties and responsibilities with which it tasked her.

158. However, due to the Ramanis’ retaliatory refusal to meaningfully communicate with Gray, Gray was left unable to complete key tasks, particularly those that required the Ramanis’ approval or Kamal’s tax-related or institutional knowledge.

159. The Company also retaliatorily eliminated core components of Gray's responsibilities, including removing Gray's ability to interview candidates.

160. Additionally, the Company hired two men into leadership roles—Raj (a General Manager) and Ben (a Fractional President)—with no involvement from—or even notification to—Gray, bypassing her entirely.

161. Ultimately, no longer willing to tolerate Gray continuing to object to—and requesting remediation of—the Company's unlawful conduct, the Company retaliatorily terminated Gray's employment.

162. Less than two weeks before her termination, Gray sent Kamal a draft email that she wanted to send to the Company's employees, which included notification of the return of their 401k "contributions".

163. Kamal refused to authorize Gray to send the email and refused to respond with any proposed changes to the language of the email.

164. Gray continued to follow up with Kamal and was met with silence.

165. Gray additionally raised her complaints about both the 401k scheme and the misclassification of employees to Devyani.

166. In addition to copying Devyani on most of the emails objecting to Defendants' unlawful conduct, Gray met with Devyani in-person on at least four occasions to express the seriousness of the unlawful conduct and complain about Deepak's and Kamal's refusal to remediate the Company's non-compliance and retaliatory hostility towards her.

167. Though she had the authority to remediate the Company's non-compliant, unlawful practices and the ability to influence her husband (Deepak) and brother (Kamal), Devyani ignored Gray's complaints and refused to make any effort to remedy the unlawful conduct.

168. In an attempt to reduce the extreme hostility Deepak and Kamal exhibited towards Gray, Gray asked Devyani to help mediate the relationship.

169. Devyani refused.

170. On May 19, 2026, as she was working, Gray lost access to her company email and to documents stored on the Company's internal drive.

171. Gray notified Deepak of her loss of access, asking him what happened.

172. Deepak responded that Gray was no longer employed by the Company due to "Employment at Will".

173. The Company provided no advance notice of or explanation for Gray's termination.

174. Prior to the Company's termination of Gray's employment, Gray had successfully completed her 90-day probationary period.

175. Prior to the Company's termination of Gray's employment, the Company did not issue Gray a negative performance evaluation, place Gray on a performance improvement plan, or otherwise indicate to Gray that her performance was unsatisfactory.

176. Prior to the Company's termination of Gray's employment, the Company did not inform Gray of any allegation that she violated any policy maintained by the Company.

177. Prior to the Company's termination of Gray's employment, the Company did not inform Gray of any allegation that she violated any policy maintained by the Company.

178. As of Gray's termination from the Company, the Company did not return the funds withheld as 401k contributions to employees.

179. Upon information and belief, as of Gray's termination from the Company, the funds withheld by the Company from employees' pay, purportedly for 401k contributions, remained untaxed, in an account maintained by the Company.

180. As of at least April 25, 2026, the Company continued to unlawfully deduct 401k "contributions" from employees' pay.

181. As of Gray's termination from the Company, the Company continued to retain those funds deducted from employes' pay, purportedly for 401k contributions, despite not having an active 401k plan.

182. Additionally, as of Gray's termination from the Company, the Company did not retroactively pay the compensation owed to its misclassified, non-exempt employees and continued to misclassify non-exempt employees.

183. In addition to Defendants' whistleblower retaliation against Gray, the Company subjected Gray to discrimination and a discriminatory hostile work environment based on her gender/sex.

184. The fashion industry is heavily dominated by women and has been since at least Gray began working in the industry.

185. During Gray's employment with the Company, the Company maintained a workforce with an approximate 60/40 female to male gender-split, employing a notably greater percentage of men than the industry norm.

186. As a notable example, by the end of Gray's employment at the Company, the Rebecca Taylor design team—the type of team that is almost exclusively women in every other fashion company at which Gray worked—was majority male.

187. Over Gray's objections, the Company filled the roles with under- or unqualified males, chosen over dozes of well-qualified female candidates.

188. Apart from the incredibly unusual gender disparity, the Company treated its female employees materially worse than male employees.

189. In the approximately four months during which Gray was employed by the Company, every one of the ten employees subjected to a termination, forced resignation, or demotion by the Company—four terminations, four forced resignations, and two demotions from full-time to part-time—was a woman.

190. As reflected in their exit interviews, the employees who resigned did so due to the subminimum pay and/or the miserable work environment.

191. Terminations and schedule reductions were dictated by the Company's executives.

192. Gray had no role in decision-making, she was tasked with carrying out the decisions of the Company's executives.

193. Two of the terminations were women who had been on the Rebecca Taylor design team.

194. Gray protested, noting that the two women selected for termination were outperforming the men on the team.

195. However, Gray's protests were ignored, and she was required to effectuate the terminations of the female employees.

196. The Company imposed more onerous requirements for women than men regarding the application of ostensibly gender-neutral policies.

197. For example, male employees calling in sick, coming in late, or attending necessary medical appointments were accommodated without any complaints, objections, or scrutiny by the Company's executives, yet female employees were excoriated, harassed, and challenged for similar, more justifiable, and less disruptive requests.

198. As one example, John Lim (a male employee) was hospitalized with kidney stones for several days and was told that he should take as much time as he needed, assured that it was not a problem.

199. However, when Public Relations Manager Genevieve [last name currently unknown] ("Genevieve"), a pregnant female employee, had an issue at her pregnancy-related, single-day doctor's appointment due to the Company's cancellation of her insurance, Kamal went on a shocking, unhinged diatribe, screaming at Genevieve.

200. Additionally, the Company regularly paid male consultants' invoices in full, without scrutiny, allowing them to bill substantial hours, whereas female consultants had their work scrutinized, hours challenged, and pay slashed.

201. On one occasion, the Company outright refused to pay a female consultant—Lauren [last name currently unknown], even though she completed satisfactory work, within scope.

202. Defendants offered male consultants higher paying contracts than female consultants, and Defendants permitted male consultants to bill disproportionately more hours.

203. The extensive hours billed by some of the male consultants for projects that did not appear to merit the amount of time billed.

204. For example, Defendants hired a building superintendent to manage a multi-story brownstone Defendants owned, which previously housed the Rebecca Taylor store on the first floor before it closed. Defendants informed Gray that they were turning the building into an AirBnB. Although Defendants' stated intention for the building was unrelated to the operations of the Enterprise, Defendants paid the superintendent through one of the Enterprise's corporate

entities. The superintendent billed as many hours as he wanted without restriction or oversight and was always timely paid.

205. When Gray questioned the extensive hours billed by some of the male consultants for projects that did not appear to merit the amount of time billed, Gray was told that "it was not [her] concern".

206. In contrast, Defendants owed one female consultant approximately $20,000, yet Deepak refused to pay her despite approximately six months of emails and requests for payment.

207. Deepak expressed a particular animosity towards pregnant employees and female employees with children.

208. Whenever Deepak became aware that a female employee needed to leave early or come in late due to a sick child, he became enraged, even though Deepak condoned male employees regularly coming in late or leaving early for no justifiable reason, often saying "no problem!".

209. In or around February 2026, Genevieve told Gray that she was pregnant.

210. Gray congratulated Genevieve.

211. Shortly thereafter, Gray shared the news with Deepak.

212. Startlingly, Deepak went on an overtly sexist, discriminatory rant against women.

213. Deepak said to Gray, **"This is why you do not hire women; they get pregnant!"**

214. Deepak told Gray that he wanted to fire Genevieve.

215. Gray responded that firing Genevieve would be obvious discrimination.

216. Over Gray's objections, Deepak demanded that Gray issue Genevieve a pretextual write-up to provide a nondiscriminatory basis for her termination.

217. Gray was forced to issue Genevieve a write-up and put her on a "final, final warning".

218. The Company executives' disdain for pregnant female employees was also reflected in the Company's lack of any paid maternity leave policy—a staple in the fashion industry and particularly critical, given the overwhelmingly young female workforce.

219. Plaintiff disclosed to her supervisors that Defendants engaged in policies, practices, and/or activities that she reasonably believed violated a rule, law, or regulation.

220. Plaintiff repeatedly objected to the Ramanis that Defendants were engaging in several policies, practices, and/or activities which she believed were unlawful, including several aspects of Defendants' improper and unlawful implementation of its ostensible 401k "plan" and the treatment of funds withheld from employees' pay as 401k contributions, as well as the unlawful misclassification and underpayment of non-exempt employees.

221. After and as a result of these disclosures, Defendants retaliated against Plaintiff.

222. After and as a result of these disclosures, Defendants retaliated against Plaintiff by fostering an increasingly hostile and abusive work environment, failing to investigate and remediate the conduct of which Plaintiff complained, preventing Plaintiff from performing her duties and responsibilities, and ultimately terminated Plaintiff's employment.

223. Defendants discriminated against Plaintiff on the basis of her gender/sex.

224. Defendants treated Plaintiff differently, and less well, because of her gender/sex.

225. Defendants discriminated against Plaintiff by fostering a discriminatory hostile and abusive work environment towards herself and other women employed by Defendants through gendered disparaging and derogatory comments and conduct, disparately treating Plaintiff and other women employed by Defendants from similarly situated male employees, fostering,

condoning, and failing to remediate the discriminatory hostile work environment, establishing, fostering, and promoting a work environment in which male employees received overt preferential treatment to female employees, and by disregarding Plaintiff's complaint of the application of discriminatory discipline to an employee of Defendants.

226. The Ramanis aided and abetted the retaliation, discrimination, and discriminatory hostile work environment to which Plaintiff was subjected by actually participating in the retaliatory, discriminatory, and harassing conduct, including by terminating Plaintiff.

227. At all times relevant to this action, the Ramanis knew or should have known that their conduct was unlawful.

228. Defendants actions were intentional and intended to harm Plaintiff.

229. At all times relevant to this action, Defendants' retaliatory, discriminatory, and harassing conduct towards Plaintiff was active and purposeful.

230. At all times relevant to this action, Defendants failed to take reasonable steps to prevent the retaliation, discrimination, and discriminatory hostile work environment to which Gray was subjected.

231. Defendants have caused damage and injury to Plaintiff by subjecting Plaintiff to by retaliation after and because she disclosed, complained of, and opposed Defendants' unlawful conduct and further, by subjecting Plaintiff to discrimination and a discriminatory hostile work environment.

232. As a result of Defendants' unlawful retaliatory and discriminatory conduct, Plaintiff was humiliated, demeaned, and belittled, and Plaintiff suffered and continues to suffer a loss of rights, emotional distress, loss of income, and earnings.

233. As a result of Defendants' retaliatory and discriminatory treatment, Plaintiff suffered and continues to suffer severe emotional distress.

234. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

235. As Defendants' conduct has been willful, reckless, outrageous, intentional, and/or malicious, Defendants are liable to Plaintiff for punitive damages.

236. Defendants' violations of the NYLL as relating to Plaintiff's employment with Defendants have been willful.

**FIRST CAUSE OF ACTION**
**Whistleblower Retaliation in Violation of the NYLL**
**(As to all Defendants)**

237. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

238. NYLL §740 prohibits an employer from, "tak[ing] any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation." NYLL § 740(2)(a).

239. By the actions described above, among others, Defendants retaliated against Plaintiff after and because she disclosed to her supervisor activities, policies, and/or practices of Defendants that she reasonably believed to be in violation of law, rule, or regulation.

240. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**<u>SECOND CAUSE OF ACTION</u>**
**Discrimination in Violation of the NYSHRL**
**(As to all Defendants)**

241. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

242. By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her sex/gender, in violation of the NYSHRL.

243. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**<u>THIRD CAUSE OF ACTION</u>**
**Discriminatory Hostile Work Environment in Violation of the NYSHRL**
**(As to all Defendants)**

244. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

245. By the actions described above, among others, Defendants have subjected Plaintiff to a discriminatory hostile work environment because of her sex/gender in violation of the NYSHRL.

246. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**<u>FOURTH CAUSE OF ACTION</u>**
**Discrimination in Violation of the NYCHRL**

**(As to all Defendants)**

247. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

248. By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her sex/gender, in violation of the NYCHRL.

249. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## FIFTH CAUSE OF ACTION
**Discriminatory Hostile Work Environment in Violation of the NYCHRL**
**(As to all Defendants)**

250. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

251. By the actions described above, among others, Defendants have subjected Plaintiff to a discriminatory hostile work environment because of her sex/gender in violation of the NYCHRL.

252. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## SIXTH CAUSE OF ACTION
**Failure to Pay Promised Wages for all Hours Worked in Violation of the NYLL**
**(As to all Defendants)**

253. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

254. Under the NYLL and supporting New York State Department of Labor Regulations, Defendants were required to pay Plaintiff at the promised rate of pay for all hours worked.

255. Defendants promised Plaintiff a starting base salary of $180,000 per year.

256. For approximately the first two weeks of Plaintiff's employment with Defendants, Defendants failed to compensate Plaintiff at all for the work she performed for Defendants.

257. Defendants violated the NYLL by knowingly and intentionally failing to pay Plaintiff any compensation for approximately the first two weeks of her employment with Defendants.

258. As a result of Defendants' willful violations of the NYLL, Plaintiff is entitled to recover her unpaid wages, liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to NYLL §§ 663(1), *et seq*.

**<u>SEVENTH CAUSE OF ACTION</u>**
**Failure to Promptly Pay all Wages Due in Violation of the NYLL**
**(As to all Defendants)**

259. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

260. NYLL § 191(c) states, "A clerical and other worker shall be paid the wages earned in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer."

261. Defendants set Plaintiff's pay date as the 10th and 25th of each month.

262. Defendants did not pay Plaintiff at all for approximately the first two weeks of her employment, spanning two pay periods.

263. Defendants failed to pay Plaintiff all wages earned when they became due.

264. As a result of Defendants' willful violations of the NYLL, Plaintiff is entitled to recover liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to NYLL §§ 663(1), *et seq*.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A. Declaring that the practices complained of herein are unlawful under applicable federal, state, and municipal law;

B. Declaring that Defendants violated the NYLL by retaliating against Plaintiff after and because she disclosed an activity, policy, or practice by her employer that she reasonably believed to be in violation of law, rule, or regulation and awarding a recovery for damages sustained;

C. Declaring that Defendants violated the NYSHRL and NYCHRL by discriminating against Plaintiff and subjecting Plaintiff to a discriminatory hostile work environment on the basis of her sex/gender and awarding a recovery for damages sustained;

D. Declaring that Defendants violated the promised and prompt pay provisions of the NYLL and supporting New York State Department of Labor Regulations;

E. Declaring that Defendants' violations of the NYLL were willful;

F. Directing Defendants to place Plaintiff in the in the position she would have occupied but for Defendants' retaliatory, discriminatory, and otherwise unlawful conduct and making Plaintiff whole for all earnings and other benefits she would have received but for Defendants' retaliatory, discriminatory, and unlawful treatment, including, but not limited to, title, seniority status, wages and other lost benefits;

G. Awarding Plaintiff compensatory monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, benefits, promotions, raises and opportunities, and other benefits of employment, incurred as of result of Defendants' violations of the whistleblower provisions of the NYLL, the NYSHRL, and the NYCHRL, in an amount to be determined at trial, plus prejudgment interest;

H. Awarding Plaintiff compensatory non-monetary and/or non-economic damages, including but not limited to compensation for mental anguish, humiliation, embarrassment, reputational harm, stress and anxiety, emotional and psychological pain and suffering, emotional and psychological distress and the physical

manifestations caused, incurred as a result of Defendants' violations of the whistleblower provisions of the NYLL, the NYSHRL, and the NYCHRL, in an amount to be determined at trial, plus prejudgment interest;

I. Awarding Plaintiff damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus pre-judgment interest;

J. Awarding Plaintiff punitive damages for Defendants' violations of the whistleblower provisions of the NYLL, the NYSHRL, and the NYCHRL, in an amount to be determined at trial, plus prejudgment interest;

K. Awarding Plaintiff unpaid promised wages pursuant to the NYLL;

L. Awarding Plaintiff liquidated and/or punitive damages in amount equal to the total amount of unpaid and unlawfully delayed wages found to be due pursuant to the NYLL;

M. Awarding Plaintiff prejudgment and post-judgment interest, retroactive to the date the damages accrued;

N. Awarding Plaintiff reasonable attorney's fees, costs, and expenses of the action pursuant to applicable law;

O. Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: September 10, 2026
Newark, New Jersey

Respectfully submitted,

**AKIN & SALAMAN P.C.**

*/s/ Justin Ames*

Justin Ames, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (201) 366-3650
Email: justin@akinlaws.com
*Attorneys for Plaintiff*